**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF NORTH DAKOTA**
**EASTERN DIVISION**

| | |
|---|---|
| BASIN ELECTRIC POWER COOPERATIVE, <br><br> *Plaintiff,* <br><br> v. <br><br> TRI-STATE GENERATION AND TRANSMISSION ASSOCIATION, INC., <br><br> *Defendant.* | Case No. 3:21-cv-00220-PDW-ARS <br><br><br> **FIRST AMENDED COMPLAINT** |

1.      Basin Electric Power Cooperative ("Basin"), by and through its undersigned counsel, hereby brings this First Amended Complaint for (1) breach of contract, (2) anticipatory breach of contract, and (3) declaratory judgment pursuant to Rules 24 and 57 of the Federal Rules of Civil Procedure and 28 U.S.C. § 2201 against Defendant Tri-State Generation and Transmission Association, Inc. ("Tri-State").  As remedies, Basin seeks declaratory and injunctive relief, specific performance, as well as attorneys' fees and costs.  In support of its claims and requested relief, Basin alleges as follows:

## INTRODUCTION

2.      Basin brings this action for breach of contract, anticipatory breach of contract, and declaratory judgment and seeks injunctive relief and to secure Tri-State's specific performance of and compliance with the parties' Eastern Interconnection WPC and to enjoin Tri-State from taking any steps or making any agreement to transfer or otherwise dispose of a substantial portion of its assets in the Eastern Interconnection in violation of Tri-State's contractual commitments to Basin pursuant to a long-term Eastern Interconnection Wholesale Power Contract (the "Eastern

Interconnection WPC").  In the relevant Eastern Interconnection WPC between Tri-State and Basin, Tri-State agreed to purchase the power requirements of its Eastern Interconnection members from Basin.  Tri-State further agreed that, should Tri-State "take[] any steps" to transfer or dispose of a substantial portion of its Eastern Interconnection assets, it "w[ould] cause irreparable injury to [Basin] which cannot properly or adequately be compensated by the mere payment of damages[.]"  Tri-State expressly granted Basin the right to "obtain from any competent court a decree enjoining such breach or threatened breach… and providing for the terms of [the relevant s]ection [of the Eastern Interconnection WPC] to be specifically enforced."

3.     Notwithstanding Tri-State's contractual commitments to Basin, Tri-State took steps to provide and then did, in fact, provide its Eastern Interconnection members with binding buy-out offers that allow those members to elect to effect early terminations of their long-term Wholesale Electric Service Contracts ("WESC") with Tri-State.  Those steps to offer buy-out terms and the offering of such buy-out terms breach Tri-State's all-requirements contract with Basin.  They constitute impermissible steps by Tri-State to dispose of Tri-State's primary Eastern Interconnection assets as those long-term power supply contracts—WESCs—between Tri-State and its Eastern Interconnection members represent the bulk of Tri-State's Eastern Interconnection assets.

4.     Basin demanded that Tri-State comply with its contractual obligations and retract the buy-out offers.  Tri-State refused.

5.     Because Tri-State refused to retract the offers, the Federal Energy Regulatory Commission ("FERC") has now made the buy-out offers irrevocable, and certain of Tri-State's members have accepted the buy-out offers.

6.     Basin brings this action for a declaration of its contractual rights and to secure Tri-State's specific performance of and compliance with the parties' Eastern Interconnection WPC.

## PARTIES, JURISDICTION, AND VENUE

7.     Plaintiff, Basin Electric Power Cooperative, is a not-for-profit, member-owned electric cooperative corporation organized under North Dakota law.  Basin's principal place of business is 1717 East Interstate Avenue, Bismarck, North Dakota, 58503.  Basin owns and operates electric generation and transmission facilities.  It primarily sells the electric power it generates via WPCs to 19 "Class A" member-owners, including Tri-State.

8.     Defendant, Tri-State Generation and Transmission Association, Inc., is also a member-owned electric cooperative corporation and is organized under Colorado law.  Tri-State's principal place of business is 1100 West 116th Avenue, Westminster, Colorado, 80234.  Tri-State is a Class A member (*i.e.*, owner) of Basin.  Tri-State resells and retransmits electricity to its member cooperatives pursuant to WESCs.  Pursuant to the Eastern Interconnection WPC between Tri-State and Basin, Tri-State purchases all the electricity requirements of its Eastern Interconnection members from Basin, with limited exceptions.

### *Subject Matter Jurisdiction*

9.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a).  There is complete diversity between the parties, the amount in controversy exceeds $75,000 (exclusive of attorneys' fees and costs), and an actual and justiciable controversy exists between the parties.

10.     The citizenship of an electric cooperative corporation is determined in the same manner as a typical corporation:  A cooperative is considered a citizen of the state of its

incorporation and its principal place of business.  *See Kuntz v. Lamar Corp.*, 385 F.3d 1177 (9th Cir. 2004).

11.     Basin is a North Dakota citizen.  Basin is a cooperative corporation organized under the laws of the State of North Dakota.  Basin's principal place of business is located at 1717 East Interstate Avenue, Bismarck, North Dakota, 58503.

12.     Tri-State is a Colorado citizen.  Tri-State is a cooperative corporation organized under the laws of the State of Colorado.  Tri-State's principal place of business is located at 1100 West 116th Avenue, Westminster, Colorado, 80234.

13.     This action concerns Tri-State's breach of an "all-requirements" contract with Basin for the supply of power to Tri-State's Eastern Interconnection members.  In 2020, Tri-State purchased more than $56 million of power from Basin for the Eastern Interconnection.  The contract term extends through 2050, during which time Tri-State is required to continue to purchase all of its Eastern Interconnection members' power requirements from Basin.  As such, the amount in controversy in this action exceeds $75,000.

### Personal Jurisdiction

14.     This Court has personal jurisdiction over Tri-State as Basin's claims arise out of and are related to Tri-State's contacts with Basin in North Dakota, which are voluntary, substantial, numerous, and span many decades.  Tri-State has purposefully and knowingly conducted business with Basin in North Dakota for decades.  This dispute arises from that business activity.

15.     In August 1964, Tri-State affirmatively engaged with Basin—a citizen of North Dakota—to establish a business relationship and contract with Basin to purchase power generated by Basin in North Dakota.  Tri-State affirmatively engaged with Basin in 1965 to become a member and owner of Basin and to purchase power from Basin.  In 1967, 1975, 1987, 1995, 2002,

2004, 2006 and, most recently, 2017, Tri-State and Basin amended and/or extended the term of Tri-State's contract to purchase power from Basin. The Eastern Interconnection WPC now runs through 2050. These contracts were negotiated over the telephone, with Tri-State calling into North Dakota to reach Basin.

16.     As part of the business relationship between Basin and Tri-State, Tri-State became a Class A member-owner of the Basin cooperative. Additionally, since July 18, 1963, Tri-State has held a seat on Basin's board of directors. The Basin board of directors meets in North Dakota on a monthly basis. Over those 58 years of board membership, Tri-State's member on the Basin board has traveled to North Dakota to participate in the monthly board meetings concerning Basin's and Tri-State's business affairs. Additional Tri-State representatives have travelled to North Dakota each year to attend Basin's annual meeting.

17.     The contractual relationship between Basin and Tri-State has supported Basin's construction and operation of power facilities in North Dakota. Tri-State has been a long-term purchaser and recipient of the power generated from those North Dakota facilities.

18.     Finally, Basin has suffered harm as a result of Tri-State's breach of contract, and that harm has been and will continue to be incurred at Basin's headquarters in North Dakota.

19.     Because this dispute arises out of Tri-State's purposeful, repeated, and consistent business relationship with Basin in North Dakota, this Court has personal jurisdiction over Tri-State.

*Venue*

20.     Venue is proper in North Dakota as Tri-State is subject to the Court's personal jurisdiction. 28 U.S. Code § 1391(b)(1); 28 U.S. Code § 1391(c).

## FACTUAL ALLEGATIONS

### *Regulatory Background*

21.     In 1936, Congress enacted the Rural Electrification Act to establish a program to provide electric power to rural America.  *See generally* 7 U.S.C. §§ 901-950b.  Following the enactment of the Rural Electrification Act, rural communities across the United States formed not-for-profit electric distribution cooperatives to deliver power to consumers.   Distribution cooperatives then banded together to create central electric generation and transmission ("G&T") cooperatives to provide a secure and economical long-term source of power.  Subsequently, in the 1950s and 1960s, these G&T cooperatives began to band together to form upper-tier G&Ts that would build generation facilities to provide power for multi-state regional systems.

22.     The Rural Electrification Act also established a financing system for the construction of electricity generation and transmission facilities.   The Act and subsequent regulations provide for the federal government to extend financing under certain conditions to rural electric cooperatives.  One such condition of the government financing was that the electric G&T cooperatives enter into all-requirements power purchase agreements, called wholesale power contracts, or WPCs, with their distribution cooperative member-owners.  The term of those WPCs was required to extend at least as long as the federal financing in order to guarantee that the G&Ts had a secure revenue stream for repayment of the federal debt.  These long-term WPCs have allowed for the creation of a stable, interdependent network whereby cooperatives could band together to build generation and transmission facilities and minimize the costs of delivering electricity to the rural communities they serve.

23.     Today, many electric cooperatives are financed by private financing, but the long-term, all-requirements WPC model remains the backbone of the rural electric cooperative system.

6

24.     Around the same time that Congress passed the Rural Electrification Act, it also sought to address perceived abuses of market power in the electricity industry.  To that end, Congress passed the Federal Power Act in 1935, creating the Federal Power Commission, and bestowed upon the Commission the exclusive authority to regulate interstate sales of wholesale electricity.  The Federal Energy Regulatory Commission ("FERC") has since replaced the Federal Power Commission and continues to regulate interstate wholesale electricity markets today.  Many rural electric cooperatives are exempt from FERC regulation.  However, both Basin and Tri-State currently are subject to FERC regulation.

### The Role of Wholesale Power Contracts

25.     Basin was founded as an upper-tier G&T cooperative in 1961 by sixty-seven G&T and distribution cooperative member-owners.  These cooperative member-owners are organized into four classes, A through D.  Class A members generally are other smaller G&T cooperatives, and Class C members generally are distribution cooperatives.  (Basin's Class B and D members are not relevant to this dispute.)  Basin has long-term WPCs with its Class A members pursuant to which Basin generates, transmits, and sells wholesale power to the Class A members.  The Class A members, in turn, have long-term WPCs with their members, primarily rural electric distribution cooperatives (which are Class C members of Basin).  Pursuant to those WPCs, the Basin Class A members transmit and sell electricity to the Basin Class C members.  The Class C members sell electricity directly to end-user consumers.

26.     The WPCs between Basin and the Class A members almost always are coterminous with those WPCs between the Class A and Class C members.  These long-term, all-requirements WPCs assure a stable market for the power produced by Basin and provide Basin with a long-term revenue stream.

27.     Basin has incurred long-term debt in order to maintain and improve its power generation system.  Like other non-profit G&T cooperatives, Basin does not have the high levels of equity that ordinarily would be required to support such long-term debt.  Basin's revenue stream from the long-term all-requirements WPCs allows Basin to service its debt obligations, which have been incurred by it on behalf of its members.  Thus, a balance is struck—Basin makes investments to support a nine-state electrical power system relying on the long-term WPCs to service its generation and transmission costs, and consumer end users obtain electricity at reasonable rates from a long-term, stable source of power.

28.     Today, Basin generates electric power that its 131 member-owners purchase and transmit across nine states to over three million residential and commercial end-consumers.  In reliance on its WPCs with its Class A Members, Basin has invested $7.2 billion to date to enable it to generate and transmit power to supply its Class A Members' power demands and intends to invest more money on a going-forward basis to serve the growing needs of those members, knowing that it will recoup those investment costs over the life of the WPCs.

### Basin's and Tri-State's Contractual Relationship

29.     The contiguous United States (with the exception of portions of Texas) is divided into two major alternating-current electric grids, the Eastern Interconnection and the Western Interconnection.

30.     Tri-State—unlike Basin's other Class A members—has member distribution cooperatives located in both the Eastern and Western Interconnections.

31.     Tri-State also has two WPCs with Basin: (1) a standard long-term, all-requirements WPC to supply its members in the Eastern Interconnection (the "Eastern Interconnection WPC," attached hereto as Exhibit A); and (2) a "Contract Rate of Delivery" (or "CROD") WPC for fixed

hourly deliveries of power for supply to Tri-State's members in the Western Interconnection. This action involves only the Eastern Interconnection WPC.

32.    The current Eastern Interconnection WPC became effective October 1, 2017, and terminates December 31, 2050. Ex. A § 14. Section 14 of the Eastern Interconnection WPC states that the WPC "shall remain in effect until December 31, 2050." *Id.*

33.    In the Eastern Interconnection, Tri-State does not generate electric power and does not have power generation assets or facilities. Tri-State is responsible for transmitting power received from Basin to its Eastern Interconnection member distribution cooperatives (its "Eastern Interconnection Member-Systems").

34.    Basin's Eastern Interconnection WPC with Tri-State is similar to the long-term, all-requirements WPC that Basin has with all of its other Class A members.

35.    Pursuant to Section 2 of the all-requirements Eastern Interconnection WPC, "[Basin] shall sell and deliver to Tri-State and Tri-State shall purchase and receive from [Basin] all electric power and energy which Tri-State shall require to supply its Member-Systems' loads in the Eastern Interconnection" (with a single limited—and immaterial—exception). Ex. A § 2.B.

36.    Section 1 of the Eastern Interconnection WPC defines "Member-System(s)" as "the Class A members [*i.e.*, distribution cooperative member-owners] of Tri-State, as of the Effective Date, whose electrical systems are connected to the Eastern Interconnection as of the Effective Date[, October 1, 2017]." Ex. A § 1.E.

37.    The Eastern Interconnection WPC allows Tri-State to add Member-Systems in the Eastern Interconnection. It does not allow Tri-State to release or remove any Eastern Interconnection Member-Systems. As of October 1, 2017, the Effective Date of the Eastern

9

Interconnection WPC, Tri-State had six Eastern Interconnection Member-Systems.  Today, Tri-State still has those same six Eastern Interconnection Member-Systems.

38.     Section 9 of the Eastern Interconnection WPC states that "Tri-State shall not without the approval in writing of [Basin], which approval shall not be unreasonably withheld, delayed or conditioned, take or suffer to be taken any steps… to sell, lease or transfer (or make any agreement therefore) all or a substantial portion of its assets, located in the Eastern Interconnection, whether now owned or hereafter acquired."  Ex. A § 9.

39.     The one exception to the Section 9 requirement that Tri-State obtain the written approval of Basin prior to taking any "steps" or "make any agreement" to transfer or dispose of a substantial portion of its Eastern Interconnection Assets is if the "the purchaser or surviving organization [*i.e.*, the Eastern Interconnection Member-System buying out of its WESC]" is "a member of [Basin]" and has in place a "validly authorized, executed and delivered… contract for electric service substantially in the form of th[e Eastern Interconnection WPC]."  Ex. A § 9.

40.     Section 10 of the Eastern Interconnection WPC states that "[Basin] and Tri-State agree that the failure or threatened failure of Tri-State to comply with the terms of Section 9 will cause irreparable injury to [Basin] which cannot properly or adequately be compensated by the mere payment of damages."  Ex. A § 10.

41.     Section 10 further states that "Tri-State agrees, therefore that in the event of a breach or threatened breach by Tri-State of Section 9, [Basin], on behalf of itself and [Basin's] other members and in addition to any other remedies that may be available to it judicially, shall have the right to obtain from any competent court a decree enjoining such breach or threatened breach of Section 9 and providing for the terms of [Section 9] to be specifically enforced."  Ex. A § 10.

***Tri-State's WPCs With Its Eastern Interconnection Member-Systems Are Assets.***

42.     It is settled law that a revenue-producing contract is an asset of the entity that is entitled to receive the revenue.  *See, e.g.*, *Fishman v. Est. of Wirtz*, 594 F. Supp. 853, 863, n.9 (N.D. Ill. 1984), *aff'd in part, rev'd in part*, 807 F.2d 520 (7th Cir. 1986).

43.     Each of Tri-State's WESCs with an Eastern Interconnection Member-System constitutes a Tri-State asset.

44.     Indeed, in the Eastern Interconnection, other than for a small amount of transmission lines, Tri-State's all-requirements WESCs with its Eastern Interconnection Member-Systems are Tri-State's only assets.

45.     Thus, each one of Tri-State's six all-requirement WESCs with its Eastern Interconnection Member-Systems represents a substantial portion of Tri-State's assets.  The termination of any one of those contracts would constitute the sale, lease, or transfer in the Eastern Interconnection of a substantial portion of Tri-State's assets.

***Tri-State Breaches the Eastern Interconnection WPC by Offering a Buy-Out Option.***

46.     Notwithstanding the prohibitions of Section 9 that "Tri-State shall not without the approval in writing of [Basin]… take or suffer to be taken any steps… to sell, lease or transfer (or make any agreement therefore) all or a substantial portion of its assets, located in the Eastern Interconnection," Tri-State's Board of Directors voted on April 9, 2020 to allow all of its distribution cooperative members (both Eastern and Western Interconnection members) the option to terminate their WESCs with Tri-State, subject to terms that might be set by the Board of Directors and subject to the approval of the Board of Directors.

47.     The terms of Tri-State's WESCs with its Eastern Interconnection members do not allow for early termination by those members.  And, the Basin/Tri-State Eastern Interconnection

WPC does not permit Tri-State to take any steps or make any agreement to release its Eastern Interconnection Member-Systems from their WESCs or terminate those contracts.

48.     The April 9, 2020 vote by Tri-State's Board was a breach by Tri-State of its Eastern Interconnection WPC with Basin.

49.     Based on a prior discussion between Tri-State and Basin concerning the Eastern Interconnection WPC, Basin understood that Tri-State included in the CTP Methodology the power of its Board to deny—and would deny—any requests of its Eastern Interconnection Member-Systems to terminate their WESCs, thereby preventing any harm from flowing to Basin as a result of its breach of contract.

50.     This understanding allowed Basin to be comfortable that, although Tri-State had breached the Eastern Interconnection WPC by choosing to offer its Eastern Interconnection Member-Systems the option to prematurely terminate their WESCs in principle, in practice, because Tri-State would refuse such requests, Basin would not be harmed Tri-State's breach.

51.     In reliance on the prior assurances provided by Tri-State Basin, accordingly, did not seek judicial intervention in April 2020 to enforce the terms of the Eastern Interconnection WPC at that time.

### *Tri-State's Decision to Offer a Buy-Out Option Was Not Required by FERC.*

52.     FERC's regulatory jurisdiction includes the authority to regulate the rates charged by electric cooperatives, including all applicable terms and conditions, under FERC's jurisdiction for wholesale sales of electricity in interstate commerce.  Such rates are called "jurisdictional rates."  Any electric cooperative that is subject to FERC jurisdiction is required to file its rates with FERC and obtain FERC's approval that its rates for interstate sales of wholesale power.  Once an electric cooperative files such jurisdictional rates with FERC, and once FERC approves such

jurisdictional rates, those rates are locked-in and become "filed rates," *i.e.*, the selling cooperative is obligated to offer and to charge only the filed rate.

53.      Importantly, FERC does not require early termination options to be included in long-term power supply agreements such as the Eastern Interconnection WPC or the Tri-State WESCs with its members.  FERC has explicitly held that cooperatives are not required to provide early termination options.  172 FERC ¶ 61,221, at ¶ 87 (Sep. 14, 2020) (Docket Nos. ER20-2441-000; ER20-2442-000; EL20-68-000) (2020 WL 5743971).  Indeed, there are "many long-term wholesale contracts on file with [FERC] that do not… include early termination provisions."  174 FERC ¶ 61,094, at ¶ 34 (Feb. 18, 2021) (Docket Nos. ER20-2441-001; ER20-2442-001; EL20-68-001) (2021 WL 646535).

54.      However, FERC has held that, to the extent that a cooperative decides to offer an early termination (or buy-out) provision, FERC must approve the rate to be paid for the early termination and determine that such rate (*i.e.*, amount to buy out) is "just" and "reasonable."

55.      Thus, as a result of becoming subject to FERC jurisdiction *and deciding to offer premature termination*, Tri-State became obligated to obtain FERC's approval of the rates it proposed to charge for premature termination of its WESCs.

56.      Prior to September 2019, Tri-State was exempt from FERC jurisdiction because it was wholly owned by other electric cooperatives that were themselves exempt from FERC jurisdiction.

57.      On September 3, 2019, Tri-State admitted a new member-owner, Mieco, Inc., a wholesale energy services company that was not an electric cooperative, thereby intentionally subjecting itself to FERC jurisdiction.  *Tri-State Generation and Transmission Ass'n Inc*., Petition for Declaratory Order on Jurisdiction Under Part II of Federal Power Act, at 9 (2019) (Docket No.

EL20-16-000 (Attached hereto as Exhibit B) ("On July 9, 2019, Tri-State's Board voted to admit a non-exempt Non-Utility Member [Meico, Inc.] in September 2019, and thus to end Tri-State's exemption [from FERC jurisdiction.]").

58.     Indeed, on December 23, 2019, Tri-State filed a petition with FERC seeking a declaratory order that it was properly subject to FERC jurisdiction (after objection by some of its members), *id*. at 13-20, and that "the Commission has… exclusive jurisdiction… over the terms, including exit charges, on which a Tri-State Member can terminate its… WESC with Tri-State," an issue of first impression for FERC. *Id.* at 32.

59.     Thus, as a result of becoming subejct to FERC jurisdiction, Tri-State *did not* become obligated to provide any of its members—whether in the Eastern or Western Interconnection—an option to prematurely terminate (or "buy out" of) their WESCs.

60.     On March 20, 2020, FERC, in response to Tri-State's December 23, 2019 petition, entered an order and held that while it found FERC had jurisdiction "over the determination of Tri-State's exit charges" such jurisdiction was not exclusive. *Tri-State Generation and Transmission Ass'n Inc*., 170 FERC ¶ 61,224, at ¶ 116 (2020) (2020 WL 1321788).  FERC continued that "if Tri-State seeks to place matters regarding its exit charges before [FERC], it should make an appropriate filing… which could include a filing setting forth a methodology for determining such charges." *Id*. ¶ 121.

61.     Importantly, FERC did not conclude that Tri-State was obligated to offer a premature termination buy-out option.

62.     Nevertheless, the Tri-State Board on April 9, 2020, voted to allow its members to prematurely terminate their WESCs and then chose to submit to FERC jurisdiction its proposed formula by which Tri-State could determine an exit charge for each of its members pursuant to its

April 9, 2020 Board action.  Tri-State refers to this formula as its "Contract Termination Payment (or "CTP") Methodology."  Tri-State filed its CTP Methodology with FERC on April 13, 2020. *Tri-State Generation and Transmission Ass'n Inc*., Initial Filing of Rate Schedule FERC No. 281 (Contract Termination Payment Methodology) (2020) (Docket No. ER20-1559-000) (Attached hereto as Exhibit C).

63.     In the transmittal letter that accompanied Tri-State's April 13, 2020 CTP Methodology filing with FERC, Tri-State noted that the Board of Director's resolution that approved the CTP Methodology required that before any member could pay a CTP amount and, thereby, terminate early its WESC, the Tri-State Board would have to give its approval.  *See id*. at 5.  This is the condition that allowed the Tri-State Board to prevent any Eastern Interconnection Member-System from prematurely terminating its WESC and, thus, ensured Basin would not be harmed as a result of Tri-State's breach.

64.     The CTP Methodology did not require any prematurely terminating Eastern Interconnection Member-System to be a member of Basin or to have in place a contract with Basin for electric service substantially in the form of the Eastern Interconnection WPC.

65.     On June 12, 2020, FERC accepted Tri-State's CTP Methodology as the filed rate and initiated regulatory proceedings to review the justness and reasonableness of the CTP Methodology and determine whether any refunds or further revisions to the filed rate were necessary. *Tri-State Generation and Transmission Ass'n, Inc*., 171 FERC ¶ 61,207, at ¶ 41 (2020) (Docket No. ER20-1559-000) (2020 WL 3127823).

66.     In its order approving the CTP Methodology, FERC noted that, while the transmittal letter that accompanied the CTP Methodology stated the Tri-State Board would have to give approval before any member could pay a CTP amount and terminate early its WESC, the

requirement was not part of the CTP Methodology filed with FERC.  *Id.* at ¶ 43.  FERC stated that this additional requirement and limitation on the availability of the CTP Methodology would have to undergo additional FERC review.

67.    On August 28, 2020, after considering Tri-State's petition for rehearing of FERCs March 20, 2020 order, FERC revised that prior ruling that it had *non-exclusive* jurisdiction over the amount of any exit charge and issued an order finding that it had *exclusive* jurisdiction to regulate any amount Tri-State might charge a distribution cooperative for a "buy-out" or early termination of a long-term power-supply agreement.  *Tri-State Transmission and Generation Ass'n, Inc.*, 172 FERC ¶ 61,173, at ¶¶ 31-34 (2020) (Docket No. EL20-16-001) (2020 WL 5093284).  FERC held that such an "exit charge" was effectively an accelerated payment for all the power the exiting cooperative would have purchased had it remained in its power supply contract for the full term and, thus, that amount constituted a rate for the wholesale sale of electricity in interstate commerce within FERC's jurisdiction.  *Id.*

68.    Yet, FERC's August 28, 2020 order still did not hold that FERC required Tri-State to provide its members the option to prematurely terminate (or "buy out" of) their WESCs.

69.    Not a month later, on September 14, 2020, FERC formally confirmed in an order related to a separate Basin proceeding that it does not require cooperatives—like Tri-State—to provide its members any early termination option.  *Basin Electric Power Cooperative*, 172 FERC ¶ 61,221, at ¶ 87 (Sep. 14, 2020) (Docket Nos. ER20-2441-000; ER20-2442-000; EL20-68-000) (2020 WL 5743971).

70.    On March 16, 2021, as part of the additional review of Tri-State's CTP Methodology initiated by FERC, Tri-State filed Board Policy 125 ("BP 125") with FERC, which was designed to establish the terms by which a member could request and receive a CTP amount.

BP 125 included the requirement that the Tri-State Board of Directors approve a member's request for a CTP Amount. *Tri-State Generation and Transmission Ass'n Inc*., [Tri-State] Initial Filing of Rate Schedule FERC No. 323 (Board Policy 125) (Docket No. ER21-1449-000) (Attached hereto as Exhibit D).

71.     On May 14, 2021, FERC rejected BP 125 due, in part, to FERC's opposition to the requirement that Tri-State's Board of Directors approve of any CTP requests. *Tri-State Generation and Transmission Ass'n*, 175 FERC ¶ 61,114, ¶ 1 (May 14, 2021) (Docket No. ER21-1449-000) (2021 WL 1946327).   FERC found that "Tri-State ha[d] not justified its proposed Board approval requirement, which would allow Tri-State to unilaterally prevent a… member from terminating its membership." *Id.*

72.     As a result of FERC's rejection of BP 125 and a June 17, 2021 FERC order to show cause in which FERC outlined additional concerns it had with the CTP Methodology on file, *Tri-State Generation and Transmission Ass'n*, 175 FERC ¶ 61,229, at ¶¶ 10-12 (Jun. 17, 2021) (Docket No. EL21-75) (2021 WL 2483934), Tri-State undertook to submit to FERC a revised process and exit charge formula for Member-Systems electing to prematurely terminate their WESCs.

73.     On September 1, 2021, Tri-State formally surrendered its ability to prevent any or all of its Eastern Interconnection Member-Systems from prematurely terminating their WESCs and filed a revised exit charge formula with FERC that eliminated the Tri-State Board's authority to approve or deny all CTP requests. *Tri-State Generation and Transmission Ass'n Inc*., Revisions to Rate Schedule FERC No. 281 (Modified CTP Methodology) (Sept. 1, 2021) (Docket No. ER21-2818-000) (Attached hereto as Exhibit E).   Thus, Tri-State extended binding, irrevocable early termination offers to all of its members, both in the Eastern and in the Western Interconnections.

*Id.* Tri-State refers to this revised formula as its "Modified Contract Termination Payment (or "Modified CTP") Methodology."

74.     Tri-State included in its filing a formula by which the actual CTP amounts could be calculated and filed an exhibit which provided the CTP amounts for each of its members (including its six Eastern Interconnection Member-Systems) that would result from such formula under then current facts. *Id.*

75.     The Modified CTP Methodology does not grant Tri-State's Board of Directors any discretion to refuse to allow any of its members'—including its Member-Systems in the Eastern Interconnection—request to pay a CTP amount to terminate early its WESC with Tri-State. *Id.*

76.     The Modified CTP Methodology also does not require that any prematurely-terminating Eastern Interconnection Member-System be a member of Basin or have in place a contract with Basin for electric service substantially in the form of the Eastern Interconnection WPC.

77.     Basin objected to Tri-State's Modified CTP Methodology filing on the grounds that the Eastern Interconnection WPC, which is an all-requirements contract, prohibits Tri-State from releasing or offering to release any of its Eastern Interconnection Member-Systems from their long-term power consumption obligations.  Basin also objected on the grounds that the contracts between Tri-State and its Eastern Interconnection Member-Systems represent all or a substantial portion of Tri-State's assets in the Eastern Interconnection, and the Eastern Interconnection WPC prohibits Tri-State from taking steps or action to transfer or dispose of those assets without Basin's consent. *Tri-State Generation and Transmission Ass'n, Inc.*, Comments of [Basin] in response to [Tri-State] Response to Order to Show Cause (Sep. 17, 2021) (Docket EL21-75-000) (Attached hereto as Exhibit F); *Tri-State Generation and Transmission Ass'n, Inc.*, Comments of [Basin] in

18

response to [Tri-State] Response to Order to Show Cause (Sep. 22, 2021) (Docket ER21-2818-000) (Attached hereto as Exhibit G); *Tri-State Generation and Transmission Ass'n, Inc.*, Motion for Leave to Answer and Answer of [Basin]) (Oct. 13, 2021) (Docket ER21-2818-000) (Attached hereto as Exhibit H); *Tri-State Generation and Transmission Ass'n, Inc.*, Motion for Leave to Answer and Answer of [Basin] (Oct. 26, 2021) (Dockets EL21-75-000, ER21-2818-000, EL21-53-000, ER20-1559, ER20-2417-000, ER21-368-000) (Attached hereto as Exhibit I).  Basin did not consent to any early termination offers to Tri-State's Eastern Interconnection Member-Systems.

78.    In addition to filing objections within the relevant FERC proceedings, on September 23, 2021, Basin sent a notice to Tri-State demanding that Tri-State amend its filing with FERC and withdraw its Modified CTP Methodology offers to the Eastern Interconnection Member-Systems.  Tri-State refused.  Echtman Letter (Sept. 23, 2021) (Attached hereto as Exhibit J).

79.    On October 29, 2021, FERC accepted Tri-State's Modified CTP Methodology, making it the "filed rate" (replacing Tri-State's previous CTP Methodology and BP 125) and initiated regulatory proceedings to determine whether any refunds or further modifications to the Modified CTP Methodology are necessary.  *Tri-State Generation and Transmission Ass'n Inc.*, 177 FERC ¶ 61,059, at ¶ 1 (2021) (Docket Nos. ER21-2818-000; EL22-4-00) (2021 WL 5050169).

80.    FERC lacks jurisdiction over state-law contract issues and, as a policy, will not decide contract disputes between cooperative.  Indeed, FERC readily acknowledges that the federal and state courts have jurisdiction to interpret the terms of contracts between electric cooperatives, even between those cooperatives otherwise subject to FERC's rate-setting jurisdiction.  FERC defers to court decisions regarding contractual rights and remedies and,

accordingly, leaves for this Court the authority to rule on Tri-State's contractual obligations to Basin.

81.     FERC evidenced this deference to state and federal courts on questions of contract interpretation when it declined to opine whether Tri-State had breached the Eastern Interconnection WPC.  Rather, FERC merely stated that FERC's own approval of the process set forth by Tri-State's Modified CTP Methodology was not a breach of the Eastern Interconnection WPC.  *Tri-State Generation and Transmission Ass'n Inc.*, 177 FERC ¶ 61,059, at ¶ 126 (Oct. 29, 2021) (Docket Nos. ER21-2818-000; EL22-4-00) (2021 WL 5050169) (FERC does "not agree that [FERC] approval of the Modified CTP Methodology itself constitutes a breach of [the WPC].").  FERC has never ruled on whether Tri-State breached the Eastern Interconnection WPC by deciding to offer its Eastern Interconnection Member-Systems the option to prematurely terminate their WESCs.

82.     Nevertheless, pursuant to FERC's rules, Tri-State is now committed to the rates that it has filed with FERC, inclusive of the Modified CTP Methodology.  Accordingly, at the present time, any of Tri-State's Eastern Interconnection Member-Systems might accept Tri-State's filed buy-out terms, and FERC would consider Tri-State bound to proceed with contract termination in violation of the Eastern Interconnection WPC.

### *An Eastern Interconnection Member-System Has Initiated the Early-Termination Process Established by Tri-State's Modified CTP Methodology.*

83.     One of Tri-State's Eastern Interconnection Member-Systems, Northwest Rural Public Power District ("NRPPD") initiated the early-termination process established by Tri-State's Modified CTP Methodology.  NRPPD Notice of Intent to Withdraw (Dec. 30, 2021) (Attached hereto as Exhibit K).

84.     On December 29, 2021, NRPPD transmitted to Tri-State its "Notice of Intent to Withdraw from [its WESC] and Membership in Tri-State." *Id.* In its Notice, NRPPD stated that it reserved its right to withdraw its Notice based on the outcome of the FERC proceeding which will finalize the Modified CTP amount it must pay.

85.     At least one other of Tri-State's Western Interconnection Member-Systems also submitted similar notices of intent to prematurely terminate their WESCs with Tri-State, including United Power, on December 14, 2021. *See* United Power Notice of Intent to Withdraw (Dec. 14, 2021) (Attached hereto as Exhibit L).

86.     NRPPD's notice to prematurely terminate its WESC does not indicate its intent to remain a member of Basin or that it has in place or will before termination execute contract with Basin for electric service substantially in the form of the Eastern Interconnection WPC. *See* Ex. K.

87.     Tri-State has challenged the validity of United Power's notice in various filings with FERC, including on the grounds that United Power—and, presumably, all of its Eastern and Western Interconnection Member-Systems—are not permitted by the Modified CTP Methodology to submit conditional notices but must, instead, submit binding notices of their intent to terminate their WESCs. *See, e.g.*, *Tri-State Generation and Transmission Ass'n, Inc.*, Motion for Leave to Answer and Answer of [Tri-State] (Jan. 4, 2022) (Docket Nos. ER21-2818-000, EL22-4-000) (Attached hereto as Exhibit M).

88.     Tri-State has not challenged NRPPD's ability to elect to prematurely terminate its WESC.

89.     Indeed, many of the harms Tri-State claims it will suffer if United Power (or any of its members) is allowed to proceed with a conditional Notice are the very harms Basin has and

will suffer as a result of Tri-State's decision to allow its Eastern Interconnection Member-Systems to prematurely terminate their WESCs at will. *Id.* Tri-State states that United Power's conditional notice "create[s] significant problems." *Id.* at 7. First, Tri-State claims it harms Tri-State's ability to "engage in long-term resource planning" and "undertake measures and make commitments to other parties to adequately address a member's withdrawal." *Id.* Second, it precipitated additional notices of intent to withdraw, and Tri-State fears that there will be a rush of withdrawal notices as a protective measure. *Id.* Third, it "invite[s] paralyzing and damaging uncertainty into the Member Withdrawal Procedures." *Id.* at 8. Fourth, these conditional withdrawals put Tri-State and its remaining members in a "precarious position from a planning and financial perspective." *Id. at 10.* And, fifth, these conditional withdrawals "could lead to downgrades of Tri-State's credit rating which could burden Tri-State and the members with additional debt service costs." *Id.*

90.     On January 5, 2022, Basin sought assurance from Tri-State that because the Eastern Interconnection WPC prohibits Tri-State from prematurely terminating NRPPD's WESC, and because NRPPD had accepted the filed rate and gave notice that it intended to prematurely terminate its WESC, that Tri-State would continue to meet its financial obligations to Basin under the WPC by continuing to pay Basin for NRPPD's actual power requirements as if NRPPD remained one of Tri-State's Eastern Interconnection Member-System. Echtman Letter (Jan. 5, 2022) (Attached hereto as Exhibit N). Tri-State refused. Sturhahn Letter (Jan. 19, 2022) (Attached hereto as Exhibit O).

### The WPC Prohibits Tri-State's Actions.

91.     The Eastern Interconnection WPC between Basin and Tri-State prohibits Tri-State from taking any steps (or making any agreements) to terminate any of its WESCs with any of its Eastern Interconnection Member-Systems without Basin's prior written consent. The Eastern

Interconnection WPC does not merely prohibit the *actual* premature termination of an Eastern Interconnection Member-System's WESC.

92.   *First*, Sections 1, 2, and 14 of the Eastern Interconnection WPC require Tri-State to "purchase and receive from [Basin] all electric power and energy which Tri-State shall require to supply its Member-Systems[]" (§2) who are "Class A members of Tri-State… whose electrical systems are connected to the Eastern Interconnection as of the Effective Date" (§1), through December 31, 2050 (§14).   Ex. A § 1, 2, 14.

93.   As set forth in these sections of the Eastern Interconnection WPC, Tri-State has contracted to purchase all the power required by those distribution cooperatives that were its Member-Systems as of the Effective Date, September 27, 2017, of the Eastern Interconnection WPC.

94.   These sections also set forth Tri-State's representation and covenant that all of its Eastern Interconnection Member-Systems as of October 1, 2017, would purchase—with limited exception—all the power they require from Basin, through Tri-State.

95.   *Second*, Section 9 of the Eastern Interconnection WPC prohibits Tri-State from "tak[ing] or suffer[ing] to be taken any steps… to sell, lease or transfer (or make any agreement therefore) all or a substantial portion of its assets, located in the Eastern Interconnection, whether now owned or hereafter [October 1, 2017] acquired" "without the approval in writing of [Basin]." Ex. A § 9.

96.   Basin has not provided Tri-State written consent to take any action to terminate any of its WESCs with any of its Eastern Interconnection Member-Systems, thus Tri-State is prohibited from doing so.

97.     In violation of Tri-State's contractual obligations in the Eastern Interconnection WPC, Tri-State voted on April 9, 2020 to allow all of its members to seek to prematurely terminate their WESCs, subejct to board approval.  Tri-State did not obtain prior written approval of Basin before taking this step and making this agreement to dispose of its Eastern Interconnection Member-Systems' WESCs, and therefore, breached of the Eastern Interconnection WPC.

98.     On or about September 1, 2021, Tri-State took further steps and made further agreements without the prior written approval of Basin to allow its Eastern Interconnection members to prematurely terminate their WESCs in violation of the Eastern Interconnection WPC by submitting to FERC its binding Modified CTP Methodology with which Tri-State authorized any of its Eastern Interconnection Member-Systems to unilaterally opt for early termination of its WESCs with Tri-State by paying a pre-determined exit charge.  *See* Ex. E.

99.     And, crucially, because Tri-State filed the CTP formula and resulting exit charge with FERC for each of its 42 members, including its six Eastern Interconnection Member-Systems, all of Tri-State's Eastern Interconnection Member-Systems currently have an early termination option.  Should those Member-Systems accept the currently filed exit charge, as NRPPD already has, Tri-State will be bound to proceed with the early termination.

100.    Tri-State put itself in a position where its regulatory obligations became inconsistent with its contractual obligations.  Tri-State chose, of its own volition and not pursuant to any FERC requirement, to create a process to allow its members to prematurely terminate their WESCs and, by so choosing, was required to submit the terms of such policy to FERC review and approval.

101.     Tri-State had no obligation contractual or regulatory to create a policy to allow any of its members to prematurely terminate their WESCs.  However, by creating such a policy, Tri-State knowingly breached its Eastern Interconnection WPC.

### *Tri-State's Breach Threatens Irreparable Harm to Basin.*

102.     In the Eastern Interconnection WPC, Tri-State recognized and agreed that "the failure or threatened failure of Tri-State to comply with the terms of Section 9 will cause irreparable injury to [Basin] which cannot properly or adequately be compensated by the mere payment of damages." Ex. A § 10.

103.     In the Eastern Interconnection WPC, Tri-State also agreed that "in the event of a breach or threatened breach by Tri-State of Section 9, [Basin], on behalf of itself and [Basin's] other members and in addition to any other remedies that may be available to it judicially, shall have the right to obtain from any competent court a decree enjoining such breach or threatened breach of Section 9 and providing for the terms of [Section 9] to be specifically enforced." *Id.*

104.     Thus, Tri-State agreed that should it take steps or make any agreement (or threaten to take steps or make any agreement) to dispose of its assets in the Eastern Interconnection, Basin would be irreparably harmed and entitled to specific performance.

105.     Should Tri-State dispose of assets in violation of the Eastern Interconnection WPC by terminating its WESCs with any or all of its Eastern Interconnection Member-Systems, Basin would be irreparably harmed.  Basin materially relies upon Tri-State's maintenance of its assets in the Eastern Interconnection.  The viability of Tri-State's business in the Eastern Interconnection is material to Basin's viability as a not-for-profit cooperative that operates power generation facilities serving the rural United States.

106.    It is the stability of the multi-tiered system of long-term, all-requirements WPCs and WESCs that allows Basin access to the massive amounts of capital (and, thus, long-term and short-term debt) needed to generate electric power to support its 131 member cooperatives.  It is the stability of the WPC and WESC system that allows Basin to provide the necessary assurance to its lenders that Basin will be able to earn sufficient future revenue to service its debt.  Basin's lenders (current and future) rely on the long-term nature of these WPCs to provide the loans Basin needs to make the investments necessary to generate and transmit electric power.  Without the assured cash flow resulting from a stable, long-term WPC and WESC system, Basin could not obtain debt financing in the capital markets at any reasonable cost, and perhaps not at all.  If not for the WPC and WESC system, credit rating agencies would assign much lower ratings to Basin than they presently do, and Basin would be forced to pay much higher interest on its debt, if it could secure debt financing at all.

107.    Tri-State's actions have harmed Basin as they destabilize the rural electric cooperative system and threaten Basin's financing and Basin's access to future credit.

108.    Tri-State's improper actions also threaten to destabilize the market for Basin's power generation.  Basin relies upon its all-requirements Eastern Interconnection WPC with Tri-State to ensure that it has an outlet for the power that it generates.

109.    Basin currently has billions of dollars in outstanding debt.  The yearly revenue of approximately $56 million that Basin currently receives from Tri-State for the Eastern Interconnection represents an important contribution to Basin's debt service.

110.    Tri-State's binding offer to allow its Eastern Interconnection Member-Systems to prematurely terminate their WESCs eliminates the stability that Basin, Basin's lenders, and the

entire rural electric cooperative system depends on for affordable financing and, accordingly, affordable power.

111.    Indeed, the harm caused by this destabilization and uncertainty is identical in kind to the harm Tri-State acknowledged it suffered as a result of the uncertainty caused by its Member-Systems' conditional notices of withdrawal and includes: (i) inability to engage in long-term resource planning; (ii) a potential rush of termination notices; (iii) paralyzing and damaging uncertainty; (iv) precarious planning and financial conditions; and (v) potential downgrades of Basin's credit ratings resulting in additional debt service costs.

112.    The harm above is why, in the Eastern Interconnection WPC, Tri-State agreed that "the failure or threatened failure of Tri-State to comply with the terms of Section 9", *i.e.*, the "taking of steps" to dispose of a substantial portion of Tri-State's assets, "will cause irreparable injury to [Basin] which cannot properly or adequately be compensated by the mere payment of damages." Ex. A § 10.

113.    In the Eastern Interconnection WPC, Tri-State also agreed that "in the event of a breach or threatened breach by Tri-State of Section 9, [Basin], on behalf of itself and [Basin's] other members and in addition to any other remedies that may be available to it judicially, shall have the right to obtain from any competent court a decree enjoining such breach or threatened breach of Section 9 and providing for the terms of [Section 9] to be specifically enforced." Ex. A § 10.

114.    Thus, Tri-State agreed that should it take steps or make any agreement (or threaten to take steps or make any agreement) to dispose (or agree to terminate) its assets in the Eastern Interconnect, Basin will be irreparably harmed and entitled to specific performance.

27

*Basin's Demands to Tri-State*

115.    When Tri-State chose on or about September 1, 2021 to extend the unilateral right to prematurely terminate WESCs to all of its Member-Systems including those Member-Systems in the Eastern Interconnection via its Modified CTP Methodology, without any ability of its Board to decline, Basin notified Tri-State that Tri-State was in material breach of the Eastern Interconnection WPC.    Basin demanded that Tri-State retract its proposed Modified CTP Methodology as applied to the Eastern Interconnection Member-Systems.  *See* Ex. J.

116.    Tri-State refused to cure its breach.  *See* Ex. O.

117.    Because Tri-State refused to cure its breach and refused to withdraw its proposed Modified CTP Methodology, on October 29, 2021, FERC proceeded to review the terms of Tri-State's premature termination process and accepted Tri-State's process established by the Modified CTP Methodology as a "filed rate." *Tri-State Generation and Transmission Ass'n Inc.*, 177 FERC ¶ 61,059, at ¶ 1 (2021) (Docket Nos. ER21-2818-000; EL22-4-00) (2021 WL 5050169).

118.    Because the Modified CTP Methodology is a now a FERC filed rate, any of Tri-State's Eastern Interconnection Member-Systems currently have the option to formally accept the buy-out terms set forth in the Modified CTP Methodology, and at least NRPPD has already accepted the terms.  Such an acceptance initiates a two-year process through which the Member-System will effectuate a buy-out and termination of its WESC with Tri-State.  FERC will hold Tri-State responsible for allowing the termination to proceed.

*        *        *

119.    Accordingly, Basin seeks a declaratory judgment from this Court, affirming that Tri-State, pursuant to its Eastern Interconnection WPC with Basin, (1) is obligated to purchase all power required by Tri-State's Eastern Interconnection Member-Systems as of the Effective Date

of the Eastern Interconnection WPC through the expiration of the Eastern Interconnection WPC in 2050, and (2) is prohibited from taking any steps or making any agreement to transfer, dispose, or terminate of its WESCs with its Eastern Interconnection Member-Systems, which represent its Eastern Interconnection assets.

120.    Basin also seeks specific performance as provided for by Section 10 of the Eastern Interconnection WPC, which specific performance would include the above declaratory judgment prohibiting Tri-State from taking any steps or making any agreement to transfer or dispose of its WESCs with its Eastern Interconnection Member-Systems as well as requiring Tri-State to amend its rate filings with FERC to remove any contract termination buy-out options for Tri-State's Eastern Interconnection Member-Systems.  Accordingly, Basin seeks a preliminary injunction requiring Tri-State to amend its rate filings with FERC to remove any contract termination buy-out options for Tri-State's Eastern Interconnection Member-Systems, as well as a permanent injunction that prohibits Tri-State from offering early termination to any Eastern Interconnection Member-Systems without Basin's prior express written consent.

## CAUSES OF ACTION

### COUNT 1
### (Breach of Contract)

121.    Basin repeats, realleges, and incorporates by reference each of the allegations set forth in paragraphs 1 through 120 as if fully set forth herein.

122.    Tri-State is in material breach of Section 9 of Eastern Interconnection WPC as a result of taking steps to allow, threatening to take steps to allow, and/or allowing its Eastern Interconnection Member-Systems to effect an early termination of their WESCs with Tri-State— and thereby taking steps to transfer a substantial portion of its assets—without Basin's prior written approval.

29

123.   Tri-State is in material breach of Sections 1, 2, 9, and 14 of the Eastern Interconnection WPC in which it covenanted that its Eastern Interconnection Member-Systems, which includes all Member-Systems as of the Effective Date of the Eastern Interconnection WPC, would purchase—with limited exception—all the power they require from Basin, through Tri-State, as a result of taking steps and/or threatening to take steps to effectuate early termination.

## COUNT II
**(Anticipatory Breach of Contract)**

124.   Basin repeats, realleges, and incorporates by reference each of the allegations set forth in paragraphs 1 through 123 as if fully set forth herein.

125.   In the alternative, Tri-State has committed anticipatory breach of contract by unequivocally repudiating its duties under the Eastern Interconnection WPC not to transfer or make agreement to transfer a substantial portion of its assets in the Eastern Interconnection.

126.   By filing its Modified CTP Methodology with FERC and refusing to amend or withdraw the Modified CTP Methodology, Tri-State has unequivocally stated its intention to commit a breach of the Eastern Interconnection WPC.

127.   By filing its Modified CTP Methodology with FERC and refusing to amend or withdraw the Modified CTP Methodology, Tri-State has unequivocally taken a voluntary act which renders it unable to perform the Eastern Interconnection WPC without breach.

128.   Tri-State's unequivocal statements and voluntary actions result in anticpatory breach of contract and give rise to a claim by Basin for damages for total breach.

## COUNT III
**(Declaratory Judgment)**

129.   Basin repeats, realleges, and incorporates by reference each of the allegations set forth in paragraphs 1 through 128 as if fully set forth herein.

130.     An actual, justiciable controversy has arisen and now exists between Basin and Tri-State concerning whether Tri-State is in material breach of the Eastern Interconnection WPC and whether Tri-State is prohibited by the Eastern Interconnection WPC from taking steps to allow its Eastern Interconnection Member-Systems the option for early termination of their WESCs with Tri-State.

131.     Basin desires a judicial determination and declaration, pursuant to 28 U.S.C. § 2201, that:

     i.     Tri-State is in material breach of Section 9 of the Eastern Interconnection WPC as a result of taking steps to allow, threatening to take steps to allow, and/or allowing its Eastern Interconnection Member-Systems to effectuate an early termination of their WESCs with Tri-State without Basin's written approval; and

     ii.     Tri-State is in material breach of Sections 1, 2, and 14 of the Eastern Interconnection WPC in which it covenanted that its Eastern Interconnection Member-Systems, which includes all Member-Systems as of the Effective Date of the Eastern Interconnection WPC, would purchase—with limited exception—all power requirements from Basin, through Tri-State, as a result of taking steps and/or threatening to take steps to reduce the number of Member-Systems with which it has WESCs.

### COUNT IV
### (Preliminary Injunction and Specific Performance)

132.     Basin repeats, realleges, and incorporates by reference each of the allegations set forth in paragraphs 1 through 131 as if fully set forth herein.

133.     Tri-State agreed in the Eastern Interconnection WPC that "the failure or threatened failure of Tri-State to comply with the terms of Section 9 will cause irreparable injury to [Basin] which cannot properly or adequately be compensated by the mere payment of damages."

31

134.    Tri-State also agreed in the Eastern Interconnection WPC that "in the event of a breach or threatened breach by Tri-State of Section 9, [Basin], on behalf of itself and [Basin's] other members and in addition to any other remedies that may be available to it judicially, shall have the right to obtain from any competent court a decree enjoining such breach or threatened breach of Section 9 and providing for the terms of [Section 9] to be specifically enforced."

135.    Accordingly, by reason of the foregoing and to prevent the wrongful conduct described herein and to prevent irreparable harm to Basin during the pendency of this action, Basin is entitled to an order requiring specific performance of the Eastern Interconnection WPC by Tri-State including by (1) directing and requiring Tri-State to immediately amend its September 1, 2021, filing with FERC to exclude its Eastern Interconnection Member-Systems from the early termination buy-out terms set forth in its Modified CTP Methodology; (2) enjoining, prohibiting, and restraining Tri-State, its agents, representatives, or anyone acting in concert with it, until the conclusion of this action, from taking steps to allow, threatening to take steps to allow, and/or allowing Tri-State's Eastern Interconnection Member-Systems to effect an early termination of their WESCs with Tri-State in violation of Section 9 of the Eastern Interconnection WPC; and (3) granting Basin such other, further, and additional relief as this Court may deem just and proper. Such preliminary injunction will protect Basin from the irreparable harm that Tri-State admits would result upon its taking of any steps, making any agreement, or threatening any steps or agreement to allow any of its Eastern Interconnection Member-Systems to terminate their WESCs during the pendency of this action as well as the harm of any Eastern Interconnection Member-System actually prematurely terminating its WESC during the pendency of this action, which termination could not easily—if at all—be reversed.

## COUNT V
### (Permanent Injunction and Specific Performance)

136.   Basin repeats, realleges, and incorporates by reference each of the allegations set forth in paragraphs 1 through 135 as if fully set forth herein.

137.   Tri-State agreed in the Eastern Interconnection WPC that "the failure or threatened failure of Tri-State to comply with the terms of Section 9 will cause irreparable injury to [Basin] which cannot properly or adequately be compensated by the mere payment of damages."

138.   Tri-State also agreed in the Eastern Interconnection WPC that "in the event of a breach or threatened breach by Tri-State of Section 9, [Basin], on behalf of itself and [Basin's] other members and in addition to any other remedies that may be available to it judicially, shall have the right to obtain from any competent court a decree enjoining such breach or threatened breach of Section 9 and providing for the terms of [Section 9] to be specifically enforced."

139.   Accordingly, by reason of the foregoing and to prevent the wrongful conduct described herein and to prevent irreparable harm to Basin, Basin is entitled to an order requiring specific performance of the Eastern Interconnection WPC by Tri-State including by (1) permanently enjoining, prohibiting, and restraining Tri-State, its agents, representatives, or anyone acting in concert with it, from taking steps to allow, threatening to take steps to allow, and/or allowing Tri-State's Eastern Interconnection Member-Systems to effect an early termination of their WESCs with Tri-State in violation of Section 9 of the Eastern Interconnection WPC; and (2) granting Basin such other, further, and additional relief as this Court may deem just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Basin hereby prays for relief and judgment as follows:

i.   With respect to Counts I, II, and III, Basin requests a declaratory judgment that Tri-State is in material breach of the Eastern Interconnection WPC between Basin and Tri-State as a

result of taking steps and/or threatening to take steps to terminate its WESCs with its Eastern Interconnection Member-Systems;

ii.     With respect to Count IV, Basin requests a preliminary injunction specifically enforcing Section 9 of the Eastern Interconnection WPC by:

1.     requiring Tri-State specifically perform under the Eastern Interconnection WPC;

2.     directing and requiring Tri-State to immediately amend its September 1, 2021, filing with FERC to exclude its Eastern Interconnection Member-Systems from the filing and the early termination buy-out terms set forth in its Modified CTP Methodology;

3.     prohibiting and restraining Tri-State, its agents, representatives, or anyone acting in concert with Tri-State, from taking steps and/or threatening to take steps to allow for the termination of its WESCs with its Eastern Interconnection Member-Systems, which steps include, but are not limited to, (a) establishing policies designed to or having the effect of granting the Eastern Interconnection Member-Systems a right to early termination of their WESCs with Tri-State and/or (b) filing with FERC any proposed methodology that is designed to or has the effect of granting the Eastern Interconnection Member-Systems a right to early termination of their WESCs with Tri-State; and

4.     prohibiting and restraining Tri-State, its agents, representatives, or anyone acting in concert with Tri-State, from allowing and/or threatening to allow any of Tri-State's Eastern Interconnection Member-Systems to terminate their WESCs with Tri-State.

iii.     With respect to Count V, Basin requests a permanent injunction enjoining further breach or threatened breach by Tri-State of the Eastern Interconnection WPC and specifically

enforcing Section 9 of the Eastern Interconnection WPC by prohibiting and restraining Tri-State, its agents, representatives, or anyone acting in concert with Tri-State, from:

    1.    taking steps and/or threatening to take steps to allow for the termination of its WESCs with its Eastern Interconnection Member-Systems, which steps include, but are not limited to, (a) establishing policies designed to or having the effect of granting the Eastern Interconnection Member-Systems an early termination right for their WESCs with Tri-State and/or (b) filing with FERC any proposed methodology that is designed to or has the effect of granting the Eastern Interconnection Member-Systems a right to an early termination of their WESCs with Tri-State; and

    2.    allowing and/or threatening to allow any of Tri-State's Eastern Interconnection Member-Systems to terminate their WESCs with Tri-State.

iv.    Costs, disbursements, and attorneys' fees, and such other and further relief as the Court may deem just and proper.

Dated this 28th day of February, 2022.

Respectfully Submitted,

/s/  *Randall J. Bakke*
Randall J. Bakke

BAKKE, GRINOLDS & WIEDERHOLT
RANDALL J. BAKKE
300 West Century Ave.
PO Box 4247
Bismarck, ND 58502-4247
T:  +1 701 751 8188
F:  +1 701 751 7172
rbakke@bgwattorneys.com

ORRICK, HERRINGTON & SUTCLIFFE LLP

LISA T. SIMPSON (*pro hac vice*)
51 West 52nd Street
New York, NY 10019-6142
T:  +1 212 506 5000
F:  +1 212 506 5151
lsimpson@orrick.com

JONATHAN A. DIRENFELD (*pro hac vice*)
1152 15th St NW
Washington, D.C. 20005-1706
T:  +1 202 339 8400
F:  +1 202 339 8500
jdirenfeld@orrick.com

MATTHEW D. LABRIE (*pro hac vice*)
222 Berkeley Street, Ste. 2000
Boston, MA 02116
T:  +1 617 880 1800
F:  +1 617 880 1801
mlabrie@orrick.com

*Counsel for Basin Electric Power Cooperative*

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 28, 2022, a true and correct copy of the foregoing **FIRST AMENDED COMPLAINT** was filed electronically with the Clerk of Court through ECF.

Ronald H. McLean (#03260)
SERKLAND LAW FIRM
10 Roberts St. N. | PO Box 6017
Fargo, ND 58108-6017
Phone: (701) 232-8957
rmclean@serklandlaw.com

Jerome H. Sturhahn, *admitted pro hac vice*
Joseph C. Daniels, *admitted pro hac vice*
SHERMAN & HOWARD, LLC
675 Fifteenth Street, Suite 2300
Denver, CO 80202
Phone: (303) 297-2900
jsturhahn@shermanhoward.com
jdaniels@shermanhoward.com

By: ___/s/ Randall J. Bakke_____
RANDALL J.  BAKKE